IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

GUADALUPE RAMIREZ, III,            §
                                   §
            Petitioner,            §
                                   §
V.                                 §          No. 3:14-cv-452-P-BN
                                   §
WILLIAM STEPHENS, Director         §
Texas Department of Criminal Justice, §
Correctional Institutions Division, §
                                   §
            Respondent.            §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Guadalupe Ramirez, III, a Texas prisoner, proceeding *pro se*, has filed
an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons
explained below, the application should be denied.

**Background**

In November 2011, following a consolidated trial, a jury in Hunt County, Texas
found Petitioner guilty of aggravated assault of a public servant, aggravated assault
with a deadly weapon (of Virginia Green, Joanna Block, and Darlene Moffitt Robinson,
separately, through three separate indictments), and aggravated robbery with a deadly
weapon, and he was sentenced to 50 years' imprisonment, 10 years' imprisonment, 15
years' imprisonment, 15 years' imprisonment, and 50 years' imprisonment,
respectively, with the sentences to run concurrently. *See State v. Ramirez*, Cause Nos.
26486, 26902, 26903, 26905, and 26968 (196th Dist. Ct., Hunt Cnty., Tex.). The

Texarkana Court of Appeals affirmed all five convictions and sentences on November 27, 2012. *See Ramirez v. State*, No. 06-11-00251-CR, 2012 WL 5960872 (Tex. App. – Texarkana Nov. 27, 2012, no pet.) (aggravated assault of a public servant [Cause No. 26486]); *Ramirez v. State*, No. 06-11-00252-CR, 2012 WL 6034426 (Tex. App. – Texarkana Nov. 27, 2012, no pet.) (aggravated assault of Virginia Green by use of a deadly weapon [Cause No. 26902]); *Ramirez v. State*, No. 06-11-00253-CR, 2012 WL 6034496 (Tex. App. – Texarkana Nov. 27, 2012, no pet.) (aggravated assault of Joanna Brock by use of a deadly weapon [Cause No. 26903]); *Ramirez v. State*, No. 06-11-00254-CR, 2012 WL 5961320 (Tex. App. – Texarkana Nov. 27, 2012, no pet.) (aggravated assault of Darlene Moffitt Robinson by use of a deadly weapon [Cause No. 26905]); *Ramirez v. State*, No. 06-11-00255-CR, 2012 WL 5961561 (Tex. App. – Texarkana Nov. 27, 2012, no pet.) (aggravated robbery with a deadly weapon [Cause No. 26968]).

Although Petitioner did not file petitions for discretionary review, he did challenge his state convictions and sentences through applications for state writs of habeas corpus, which the Texas Court of Criminal Appeals (the "TCCA") denied without written orders on January 8, 2014. *See Ex parte Ramirez*, WR-80,672-01, -02, -03, -04, -05 (Tex. Crim. App.).

Petitioner's federal habeas application was timely filed on or about January 21, 2014. *See* Dkt. No. 3 at 12.

The Texarkana Court of Appeals decision affirming Petitioner's aggravated robbery conviction and sentence sets out in detail the underlying factual background

supporting all five convictions and sentences:

> The hopes of patrons at Bonnie Lou's Game Room in Hunt County that they might have a lucky night at the establishment's gaming slots were shattered shortly before midnight by a violent robbery by three men wearing bandanas and hoodies. The three robbers inside the building were described by various witnesses as "African–American," "colored," or "dark complected, black"; as including one who "looked like he was black"; or as including two African–Americans and one Caucasian.

> Guadalupe Ramirez, III, who is Hispanic, has been convicted by a jury of aggravated robbery with a deadly weapon.

> ...

> Fifty or sixty patrons were at Bonnie Lou's Game Room when the robbery occurred. Employee Shelbie Crisp testified that three "colored" men wearing bandanas and hoodies burst in through the only entrance, "immediately shot into the ceiling[,] and told us to get on the floor." Crisp clung to the ground next to customers as the three men "branched out" and began shouting commands, confiscating cell phones, and "being violent." She saw that two of the robbers had guns and identified the colors of the three hoodies as gray, black, and red. She believed that the man who fired the shot was wearing a red bandana.

> Patron Virginia Green was standing outside of the game room talking to her nephew on her cell phone when she "felt a push," "went flying through the door onto the floor[,] and slid across the carpet." She looked up and saw what she described as "three" "dark complected, black" men. All three men were carrying guns and wearing bandanas and hoodies. One gunman grabbed her cell phone and her purse, and all three were "all over the place" "yelling and screaming and saying, you know, we're in charge of this. If you move, we'll shoot you." Virginia testified, "I thought I was going to die." She had a carpet burn on her arm and a "big bruise" on her hip. Virginia complied with the gunmen's requests and remained on the floor.

> Seventy-two-year-old Vincenta Luna Ramirez saw the three men enter the game room. She testified that an African–American man "shoots a gun and hits me in the back with a fist in between my lungs and throws me to the floor." Vincenta stated that the man "pulled me all the way to the back, and my knees, ... [and] elbow ... had carpet burns." Vincenta testified that the man said, "I want your money" and that she then "threw

her purse at him." She testified, "I thought at my age, I was going to die like that."

Andrew Collins recounted the event this way. Collins was at the game room with his wife, Linda, when an "African–American" man wearing a gray hoodie and a white or gray bandana came "though the door pushing people down, shot a gun in the air" and told "everybody to get down on the floor," and give up their "cell phones and money." Another man who "looked like he was black" was "yelling also for people to get on the ground and give up cell phones." According to Collins, there were three men, and two were carrying guns. Collins "could hear them kicking and hitting other people," and he became concerned for his wife's safety. He testified, "I figured I was going to see if they were going to find" his wife. As Collins was looking for her, one of the men "raised" him "from behind and put a gun to [his] head." Collins "knocked" the gun away and was struck three times with the gun. He testified that the man "[h]it [him] on the top of the head," "on the side of the head," and "in the neck" before shoving him back on the ground. Collins' head was "sore," he was bleeding, and he would later require hospital treatment. The gunmen took his cigarettes and lighter and moved on. Collins testified that three other people were assaulted.

Witness Theresa Green testified that the robbers were three "African–American" men, and that one of them stood over her and asked her for a cell phone. Green stated that after she told the robber she did not have a cell phone, "[h]e kicked me in the ribs and pointed the gun in my dad's face and grabbed my mom's cell phone. She had $20 in her hand, and he grabbed the $20 from my mom's hand. And then he was walking around getting everyone's cell phone." Based on her experiences that night, Theresa believed the three robbers were working together.

Darlene Robinson was lying on the floor of the game room with her sister, Joanna Brock. She believed that, of the three perpetrators, two were African–American, and one was Caucasian. Robinson also thought that only one man was carrying a gun. She used her cell phone to dial 9–1–1 as the robbers were spreading out and yelling commands. She testified,

> [t]he guy up front was—kept hollering, everybody get up here. And my sister and I raised our heads up to look at him to see if we were supposed to move from where we were. And as we raised our head [sic] up, they came up from behind, came up from behind us on the aisle and hit me on the head and hit her on the head [with a gun].

-4-

Robinson was scared and knew "[t]here was a possibility we could get killed." Robinson was worried for her sister because Brock "was bleeding all over the place."

Brock was terrified. Like her sister, Brock dialed 9–1–1 and allowed the dispatcher to listen to the events unfolding at the game room. She remembered "a man in a dark blue hoodie kicking some man at the end of the aisle." She testified that she was hit "from the back" and did not see the man who hit her. Brock testified that the blow "[s]plit [her] head open," causing her to pass out. Her next memory of the incident was "[c]oming to in a pool of blood" after the robbers fled. She was later hospitalized.

After the patrons had been satisfactorily subdued, the robbers "asked who worked there in order to get in the safe," and Crisp "stood up and let them know that that was me." She recalled, "The one that had the red bandana on, he came up behind me and was shoving me, physically pushing me towards the counter." Theresa testified that a man "grabbed [Crisp] by the head of the hair and was pushing her back there behind the counter." The other two men joined the third man "behind the counter," and Crisp "opened the safe." Crisp testified that she had about $1,000.00 or $1,200.00 in her apron, that the safe had "about $4,500, give or take 500," and that the men put the money in plastic grocery sacks.

After handing over the money, Crisp was "afraid of being shot," and turned her "back towards where they were standing ... because I didn't want them to think that I was ... trying to eye them or anything." Crisp heard the men walk out of the game room. She testified, "[M]aybe ten seconds later, the one with the red bandana came back in and proceeded to demand more money from me and use foul language and cursed, and I just said I don't have any more money ... And he ran back out." He was carrying a gun.

Crisp testified that, after the men left, "everyone started ... slowly getting up off the floor. And we could—we could see that there were several people that had been injured. There was blood everywhere, and we had people, several people ... calling 911." Theresa testified, "As soon as the guy at the door took off running out the door, I got up and ran out the door right behind him." She was less than two feet from the getaway car and able to provide a description to law enforcement. Collins also went to the door to "see what they were driving." He testified that he "saw a silver car pulling out of the parking lot."

Hunt County Deputy Sheriff David Arndt testified that "several people [were] calling 911, screaming and asking for help." He was the first to arrive at the game room after the robbers had left. Arndt stated that several "excited and scared" people "were all coming up to me screaming" in the parking lot. He observed, "[O]ne or two people outside that had injuries" including a lady that "had been hit ... on the back of the head and was bleeding ." He quickly obtained suspect and vehicle descriptions and called it into dispatch. He concluded that the suspects were "black" males.

Officer Joseph Fernandez, who was already en route to the game room, was told the vehicle's description and direction of travel. He quickly turned around and encountered a silver vehicle matching the description with three people inside. He notified Arndt that he had "caught up" with the vehicle. Arndt testified that he did not enter the game room "until after Deputy Fernandez had already gotten behind the vehicle with the suspects." Arndt testified that when he got inside, he saw "some people were on the floor. Some people were sitting in the chairs that had been hit in the head. I noticed there was blood on the carpet where some people had sustained injuries." He described "two bullet holes in the ceiling just above the doorway." Paramedics were called to assist the victims. In speaking with witnesses, Arndt concluded that "[s]everal cell phones," cash, a recording device, and Wal–Mart gift cards were missing. He testified, "Several people stated that everybody had a firearm, and some stated that ... it might have just been one or two."

Officer Jeffrey Reese testified that he saw Fernandez' patrol unit chasing the suspect vehicle "with his lights activated." He testified, "[T]hey had already came [sic] to a stop at the intersection of 276 and 34. I heard gunshots at that time and proceeded up in the intersection. And as I approached the intersection, I saw the deputy running to his vehicle."

As Fernandez was chasing the suspects, he noticed "that they were talking to each other, kind of ... panicking." Fernandez testified that, after the vehicle stopped at the intersection:

> The passenger, front passenger of the vehicle jumped out of the vehicle—jumped out and shot. Before he jumped out, I had opened my car door.... It was a black male.

> The only thing I remember is blue gloves, and he had a bag in his hand. And as he jumped out, he was coming back

> towards my vehicle, and immediately, as soon as he turned
> around towards my vehicle, he pointed his arm up at me,
> and there—I think what appeared to be a gun and opened
> fire.
>
> I dove from my vehicle, stepping out. I think I remember
> shooting one round ... but he continued shooting at me. I
> crawled on my hands and knees to the back of my car.... The
> car was still in drive because I didn't have time to put it in
> park.
>
> I turned over and sat on my butt, and immediately thinking
> he was right behind me; he wasn't.... [M]y taillights were
> glaring on an object that appeared to be a man walking
> towards me with a gun pointed at my head.
>
> I lifted my arm and shot until he collapsed. And then I
> waited until he was—until what I thought he was subdued.

Fernandez testified that the shooter, an African–American male later identified as Vincent Thomas, had a bag of money and a Winchester .380 caliber gun. Thomas was killed by Fernandez' bullets. Concerned that the other passengers in the car could have weapons, Fernandez "got up and chased the car, the suspect car, and shot at the car." It sped off.

Reese saw the "small sedan turn and go towards Greenville." He followed the suspect vehicle at "94 miles an hour" with lights and sirens activated. Another unit, driven by Officer David Wilson, joined the chase. Eventually, Trooper Jay E. Simpson "deployed stop sticks" that "punched" the tires of the suspects' vehicle. The vehicle came to a stop after a few miles, and Reese commanded the occupants to exit the vehicle.

Simpson identified Ramirez as the driver. He believed Ramirez was on PCP and very intoxicated and "scary." Ramirez was also experiencing seizures. Wilson testified that the other passenger was an African–American male named Darius Williams. According to Wilson, both suspects needed medical attention even though they had not sustained any visual injuries. Hospital test results revealed that Ramirez had alcohol, PCP, cocaine, and an opiate in his system. His blood alcohol level was ".09, plus or minus .01." At the time of death, Thomas also had alcohol, PCP, Hydrocodone (an opiate), and marihuana in his system. Thomas was wearing a gray sweatshirt, black sweatpants, and a red bandana.

Detective Tommy Grandfield testified that they confiscated $5,143 .00 from Thomas' bag and $430.00 from his shoe. Simpson testified that there were reports of "items that possibly could have been thrown out of the vehicle." He "went back to that location" and was "just looking along the side of the road" to see if there were items that were thrown out. Simpson recovered red and black hoodies and a black undershirt approximately five miles from the intersection of "276 and 34." Three cell phones and a pocket knife were removed from the suspects' vehicle, which was registered to Thomas' girlfriend, Carla Thornton. At trial, Theresa testified that Thornton's vehicle was the one she saw pulling out of the game room parking lot.

Ramirez has a different version of the events. Ramirez met Thomas in prison. On the day of the robbery, Ramirez was transported by Thornton's son to a party at Thomas' house. Thomas, Williams, and "two other black dudes" known as "Buck" and "Cockalocka" were present. Ramirez smoked PCP, drank, and inhaled cocaine. Thomas became "real aggravated," Cockalocka became upset and left with "Buck." Ramirez thought "the PCP had [Thomas]." He asked for a ride home and Thomas and Williams eventually agreed to drop him off. Ramirez sat in the backseat.

Williams asked Ramirez if he had money and suggested that they should go play slots at the game room. Ramirez told the jury that he "was drunk and throwing up" and "fell asleep on the way" to the game room. He claimed, "[W]hen I woke up again, I heard a door slam in the car, and a pistol was produced in my face. They told me to get my fat ass up in the front seat and drive the car and give ... [them] my cell phone." Ramirez complied.11

The keys were already in the ignition. Ramirez said that Thomas hit him in the head with the pistol and threatened his life if he stopped driving. He claimed that, when he stopped at the intersection of "276 and 34," he had no idea that Thomas was going to get out and shoot at Fernandez. He testified that he continued driving because Fernandez was shooting at the car. Ramirez told the jury that he did not conspire with anyone to rob the game room. He admitted that he did not tell anyone that he had been hit in the head and claimed to be wearing only a "muscle shirt underneath and a pair of jeans" on that February day. When asked what other third person could have robbed the game room besides Thomas and Williams, Ramirez responded, "[I]t was other people that—that could've been there."

-8-

Rejecting Ramirez' testimony, the jury convicted him of aggravated robbery with a deadly weapon.

*Ramirez*, 2012 WL 5961561, at *1-*5 (footnotes omitted).

Through his federal habeas application, Petitioner asserts eight grounds for relief. *See* Dkt. No. 3 at 6-9. Four of those grounds [Ground 1, 2, 4, and 8] appear to be challenges to the procedure with which the state courts resolved his state habeas applications. In addition, he asserts that: the trial court violated his right to due process by improperly commenting on the weight of the evidence [Ground 3]; he was denied due process – the right to a grand jury indictment – when the trial court amended the indictment in Cause No. 26903 before trial to allege a lesser-included offense [Ground 5]; his trial counsel was constitutionally ineffective for agreeing to the amendment of the indictment in Cause No. 26903 before trial [Ground 6]; and the State used perjured testimony, and committed prosecutorial misconduct, "by allowing a witness to change her initial and out of court statement concerning the number of robbery suspects" [Ground 7].

## Legal Standards

Where a state court has already rejected a claim on the merits, a federal court may grant habeas relief on that claim only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.... A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citations and internal quotation marks omitted). "Under § 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102 (internal quotation marks omitted).

The Supreme Court has further explained that "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* at 101 (internal quotation marks omitted). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. The Supreme Court has explained that, "[i]f this standard is difficult to meet, that is because it was meant to be," where, "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already

rejected in state proceedings," but "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents," and "[i]t goes no further." *Id.* Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *accord Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) ("If this standard is difficult to meet – and it is – that is because it was meant to be. We will not lightly conclude that a State's criminal justice system has experienced the extreme malfunctio[n] for which federal habeas relief is the remedy." (internal quotation marks and citations omitted)).

As to Section 2254(d)(2)'s requirement that a petitioner show that the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," the Supreme Court has explained that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance" and that federal habeas relief is precluded even where the state court's factual determination is debatable. *Wood v. Allen*, 558 U.S. 290, 301, 303 (2010). Under this standard, "it is not enough to show that a state court's decision was incorrect or erroneous.

Rather, a petitioner must show that the decision was objectively unreasonable, a substantially higher threshold requiring the petitioner to show that a reasonable

factfinder must conclude that the state court's determination of the facts was unreasonable." *Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (brackets and internal quotation marks omitted).

The Court must presume that a state court's factual determinations are correct and can find those factual findings unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001).

This presumption applies not only to explicit findings of fact but also "to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *see also Harrington*, 562 U.S. at 98 ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) ("a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc))).

In sum, Section 2254 creates a "highly deferential standard for evaluating state court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). To overcome this standard, a petitioner must show that "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

## Analysis

### I.      Challenges to the State Habeas Proceedings [Grounds 1, 2, 4, and 8]

Petitioner appears to challenge the state habeas proceedings themselves. *See, e.g.,* Dkt. No. 3 at 6 ("In essence [Ground 1] is tantamount to a challenge to the evidence. The State answered with what amounts to a General Denial; the Trial Court answered nothing, the Court of Criminal Appeals Denied without a written order unsupported by the records, and contrary to, or unreasonable application of federal law as cited in the State's Habeas Proceedings."). But a Section 2254 applicant is not "entitled to habeas relief on a mere showing that the Texas courts ... misapplied their own procedural rules to his state habeas petition." *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (per curiam). "Rather, the district court's habeas jurisdiction extends only to claims that the petitioner 'is in custody in violation of the Constitution or laws or treaties of the United States,' and it is only on a finding of such a violation that the court may grant habeas relief." *Id.* (quoting 28 U.S.C. § 2254(a)).

To the extent that Petitioner's challenges to the state habeas proceedings include a claim of ineffective assistance of counsel, *see* Dkt. No. 3 at 6 (Ground 2), "[t]here is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings," *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (citations omitted).

### II.     Alleged Comment by Trial Court [Ground 3]

In his federal habeas application, Petitioner contends there was "fundamental

error" because the state trial court's "charge" contained an "impermissible comment" "on the evidence." Dkt. No. 3 at 7. Although Petitioner fails to identify the comment at issue – and, as such, this ground for relief is subject to dismissal as conclusory, *see Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("conclusory allegations ... do not raise a constitutional issue in a federal habeas proceeding") – in Petitioner's state habeas application related to his conviction for aggravated assault of a public servant, Cause No. 26486, he points to the trial court's instruction that a sheriff's deputy is a public servant, *see* Dkt. No. 9-13 at 11-12 ("The fact that the State made 'A Hunt County Sheriff's Deputy' an allegation in the indictment and applied the law to the fact in the application paragraph, 'A Hunt County Sheriff's Deputy' was a factual issue. It was a fundamental error for the court to comment on the evidence in the charge to the jury in light of the evidence of 'public servant.'").

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "the Supreme Court held that a federal habeas court may not grant relief on trial errors unless the petitioner demonstrates that the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999) (quoting *Brecht*, 507 U.S. at 637-38). The United States Court of Appeals for the Fifth Circuit "has interpreted this standard in the following manner:

> [U]nder *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had a substantial effect or influence in determining the verdict. We recognize, however, that if our minds are "in virtual equipoise as to the harmlessness," under the *Brecht* standard, of the error, then we must conclude that it was harmful.

-14-

*Id.* (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996)).

Here, it is not clear if the state courts conducted a harmless error review. But it is clear that Petitioner has failed to demonstrate that the trial court's comment had a substantial and injurious effect or influence in determining the jury's verdict, especially because the jury was still required to find that the individuals were in fact sheriff's deputies and that they were acting in their roles as sheriff's deputies to find Petitioner guilty of the offense. *See* TEX. PENAL CODE 22.01. Regardless, Petitioner has not shown that the TCCA's denial of this claim is either inconsistent with a prior decision of the United States Supreme Court or objectively unreasonable. *See Harrington*, 562 U.S. at 98, 102; *Batchelor*, 682 F.3d at 405.

## III.   Amendment of the Indictment [Ground 5]

Petitioner alleges that the amendment of the indictment in Cause No. 26903 – the striking of certain language such that Petitioner was no longer charged with aggravated robbery with a deadly weapon but with the lesser-included offense of aggravated assault with a deadly weapon – violated his "right [to] a grand jury indictment." Dkt. No. 3 at 8.

This ground for relief is without merit because "[t]he sufficiency of a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment is so defective that it deprives the state court of jurisdiction." *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994) (citing *Branch v. Estelle*, 631 F.2d 1229 (5th Cir. 1980)).

> For an indictment to be "fatally defective," no circumstances can exist under which a valid conviction could result from facts provable under the indictment. *Morlett v. Lynaugh*, 851 F.2d 1521, 1523 (5th Cir. 1988).
>
> State law determines whether an indictment is sufficient to vest jurisdiction in the state trial court. *Williams v. Collins*, 16 F.3d 626, 637 (5th Cir. 1994). Under Texas law, "indictments charging a person with committing an offense, once presented, invoke the jurisdiction of the trial court and jurisdiction is no longer contingent on whether the indictment contains defects of form or substance." *Teal v. State*, 230 S.W.3d 172, 177 (Tex. Crim. App. 2007). [Even the] "failure to allege an element of an offense in an indictment or information is a defect of substance," as opposed to one of jurisdiction. *Studer v. State*, 799 S.W.2d 263, 268 (Tex. Crim. App.1990). As acknowledged in *Studer*, if omitting an element from an indictment is a defect of substance in an indictment, it naturally follows that the indictment is still an indictment despite the omission of that element. *Id.*

*Fields v. Thaler*, Civ. A. No. H-11-0515, 2012 WL 176440, at *6-*7 (S.D. Tex. Jan. 20, 2012).

The indictment at issue, even after amendment, charged Petitioner with the "commission of an offense, which was sufficient to vest jurisdiction in the trial court"; thus, any defect in that indictment is substantive, not jurisdictional, and "Petitioner [is not] entitled to habeas relief under this issue." *Id.* at *7 (citations omitted).

## IV. Alleged Ineffective Assistance of Trial Counsel [Ground 6]

Petitioner also appears to contend that his trial counsel was constitutionally ineffective for allowing the indictment in Cause No. 26903 to be amended prior to trial. *See* Dkt. No. 3 at 8.

The Court reviews Sixth Amendment claims under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the petitioner must demonstrate that the performance of his attorney fell below an

-16-

objective standard of reasonableness. *See* 466 U.S. at 687-88. To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The petitioner also must prove that he was prejudiced by his attorney's substandard performance. *See id.* at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Petitioner fails to explain how counsel's agreeing to the amendment of an indictment prior to trial, to remove language that charged Petitioner with a greater offense, amounts to either deficient performance or prejudice – particularly because Petitioner had already been explicitly charged with the same, lesser-included offense of aggravated assault with a deadly weapon by two separate indictments (as to separate individuals).

Here, moreover, the TCCA implicitly found that Petitioner's trial counsel did not render ineffective assistance by rejecting this claim. As such, the "pivotal question" for this Court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101; *see also id.* at 105 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal quotation marks and citations omitted)). This Petitioner clearly has not shown. *See*

*Garza v. Stephens*, 738 F.3d 669, 680 (5th Cir. 2013) ("We conclude that Garza has not met his burden to show that the state habeas court's conclusion on this claim amounted to an unreasonable application of *Strickland* or an unreasonable determination of the evidence." (citing 28 U.S.C. § 2254(d)(1)-(2))).

## V.     Alleged Prosecutorial Misconduct [Ground 7]

Petitioner's final ground for relief is that "the State used perjured testimony by allowing a witness to change her initial out of court statement concerning the number of robbery suspects which were factual and material." Dkt. No. 3 at 9. As presented in the federal habeas application, this ground is undoubtedly "conclusory" and, as such, "do[es] not raise a constitutional issue." *Miller*, 200 F.3d at 282.

But the state court records reveal that Petitioner raised this claim in the state habeas proceeding related to Cause No. 26902, his conviction for aggravated assault of Virginia Green by use of a deadly weapon. *See* Dkt. No. 9-11 at 11 ("State used perjury testimony. State's witness Mrs. Virginia Green, prior to trial reviewed her initial sworn statement she gave at the time of the offense.... The records clearly show that Mrs. Green slowly but for surely changed or amended her statement by testifying falsely... The testimony of whether there were (3) or (4) masked robbers were an important factor in the case, in light of Defendant's testimony claiming innocent by being asleep in the car in which he were forced to drive in the aftermath of the robbery.").

"The Due Process Clause of the Fourteenth Amendment forbids the government from knowingly using, or failing to correct, false testimony." *United States v. Mason*,

293 F.3d 826, 828 (5th Cir. 2002) (citing *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)); *see also Isaac v. Cain*, 588 F. App'x 318, 327 (5th Cir. 2014) (per curiam) ("Under *Napue*, 'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" (quoting 360 U.S. at 269) (citations omitted)).

"To establish a due process violation based on the government's use of false or misleading testimony, a petitioner must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997). But "due process is [ ] implicated by the prosecution's introduction or allowance of false or perjured testimony [only when] the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements." *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981) (citations omitted). Thus,

> [w]hen attempting to show perjured testimony, the false or misleading nature of certain testimony cannot be established simply by pointing to contradictory testimony from other witnesses, inconsistencies within a witness's testimony, or conflicts between or among written statements and live testimony. Such matters go only to the weight of the evidence and the credibility of the witness.

*Craig v. Director, TDCJ-CID*, No. 5:07cv167, 2013 WL 4711483, at *14 (E.D. Tex. Aug. 30, 2013) (citing *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990)).

All Petitioner has alleged is that Ms. Green's testimony was inconsistent. But, even if the Court were to assume – which it should not – that Ms. Green's testimony

was actually false, Petitioner still has failed to show that the prosecutor knew Ms. Green's testimony was false.

## Recommendation

Petitioner's application for writ of habeas corpus should be denied.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: August 27, 2015

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE